April 7,
1936.

PETITION OF THE

NEW HAMPSHIRE GAS & ELECTRIC COMPANY.

*Laurence I. Duncan* and *Robert W. Upton* (*Mr. Upton* orally), for the petitioner.

*Francis W. Johnston, Attorney-General,* and *Louis E. Wyman* (*Mr. Wyman* orally), for the State.

PAGE, J.   The former opinion in this case is withdrawn.

(1) (2) The first two questions may be considered together.   The petitioner contends that the proposed issues must be found consistent with the public good as a matter of law.   All of the securities retired in 1926 were valid because approved by the commission after findings that they were supported by expenditures for plant, less allowances for property items displaced, and that the issues were consistent with the public good.   It is urged that, while the commission has made no finding that the issues now proposed are consistent with the public good, such a finding is required because of the valid character of the securities retired in 1926, so that as a matter of law the commission must approve the present issue of securities equivalent, dollar for dollar, to those retired, the proposed securities being used to repay to the lender holding company so much of the loan as represented the par of the retired securities.

On the other hand, the state contends that, along with other facts and circumstances, the commission may now consider the present value of the capitalizable property of the petitioner.   It is not contended that present value must, as a matter of law, be conclusive as to the question of public good which the commission is bound to determine in the present proceeding.

The petitioner is understood to rely principally upon the claim that P. L., *c.* 241, *ss.* 1-4 requires the commission to determine the question of public good solely upon the cost of acquiring property.   Those sections read as follows:

"1. **Purposes.** A public utility or railroad corporation lawfully engaged in business in this state may, with the approval of the public service commission, but not otherwise, issue its stock, bonds, notes and other evidences of indebtedness payable more than twelve months after the date thereof, for the purpose of defraying the cost of acquiring property of any kind which is reasonably requisite for present or future use in the conduct of its business in this state, or of constructing, completing, extending or improving its plant, equipment or facilities for doing such business, or of maintaining or improving its service to the public within this state, or of providing itself with working capital, or for any other purpose authorized by law, including the payment or refunding of any outstanding indebtedness or securities issued for any such purpose.

"2. **Application.** Any such public utility or railroad corporation which may apply to the public service commission for authority to issue such securities shall file with its application a statement in reasonable detail, showing the actual amount of items of expense already incurred and the estimated amount of items of expense to be incurred for any of the purposes defined in the preceding section which it may desire to capitalize.

"3. **Authorization.** The commission, after hearing and such reasonable investigation and inquiry as it may deem proper, shall determine the actual or probable cost of such items; and, if in its judgment the issue of such securities upon the terms proposed is consistent with the public good, it shall authorize the same to an amount sufficient, at the price fixed in accordance with the laws applicable thereto, to provide funds for defraying the cost as so determined.

"4. **Evidence Considered.** Upon consideration of any such application, the commission may take into account all facts and circumstances which may be relevant to the question whether the proposed issue of securities may be made consistently with the public good . . . .

"6. **Depreciation.** Upon any application for authority to issue securities for the purpose of providing funds for discharging any indebtedness incurred by a public utility in good faith prior to July 1, 1914, in acquiring property or accomplishing any of the other purposes specified in section 1, no deduction shall be made from the cost thereof, as determined by the commission, on account of any estimated depreciation of plant and properties, beyond the portion, if any, of such cost which it may appear has been paid out of the depreciation reserve of said public utility, if any, or out of earnings, to make good depreciation."

There is no question that the object of the statute is to avoid over-capitalization contrary to the public interest. *Grafton &c. Co.* v. *State*, 78 N. H. 330. A prime test is not to permit the capital issues to exceed, at least so much as to affect the public interest materially, the fair cost of the property reasonably requisite for present or future use, plus necessary working capital and any other authorized requirements.

But some limitation of this is apparent in section 6, which was originally enacted as part of section 2 of Laws 1915, *c.* 115, which put the statute above quoted substantially into its present form. In that act, what is now section 6 is appended to what now appears as P. L., *c.* 241, *s.* 4.

Here the legislative intent was expressed to permit the commission to capitalize securities issued for the purpose of providing funds for discharging indebtedness (except that incurred in good faith prior to July 1, 1914) at such a figure as represented the difference between actual cost and estimated depreciation. The date of July 1, 1914, was apparently fixed upon in view of the fact that it was the last date when utilities had been required to report to the commission. Besides that, depreciation accounts had not been required prior to Laws 1913, *c.* 98. The provision was not retroactive, but thereafter utilities must take proper depreciation at their peril with respect to later capitalization.

That the intent of the legislature was as stated is to be gathered from the original draft of House Bill No. 331, session of 1915, which contained no provision for consideration by the commission of "all facts and circumstances which may be relevant to the question" of public good. On the contrary, it required the commission, in every case, to authorize the issue at actual cost, but with permission to deduct therefrom the amount of the depreciation reserve account accumulated by the utility during the period covered. The act, as finally passed, permitted the commission to "take into account all facts and circumstances," and forbade their deducting, in refunding indebtedness incurred in good faith prior to July 1, 1914, any sum for depreciation beyond what had actually been paid out of depreciation reserve or earnings to make good the depreciation.

It is clear enough that the legislature intended, when giving to the commission the power to consider "all facts and circumstances," to include the right to take into account the estimated depreciation that had occurred during the period since the indebtedness to be funded, or refunded, had been incurred; and that only as to indebtedness in-

curred in good faith prior to July 1, 1914, was the deduction to be limited to what had actually been paid out of depreciation reserve or earnings in order to make good the depreciation. As before suggested, each utility must, beginning with its next return, protect itself as to all future security issues, by building up sufficient depreciation reserves to cover actual depreciation, so that the chance of future over-capitalization would be guarded against to the largest practical degree possible.

The idea expressed by the legislature in 1915 was not entirely new. A little more than a year earlier, the public service commission had discussed in *Petition of Laconia Gas & Electric Company*, 4 N. H. P. S. C. 52, 60, a capitalization case, the bearing of the act of 1913 (P. L.; *c*. 240, *ss*. 9-13) making mandatory the carrying of adequate depreciation accounts by all public utilities. The commission thought that the legislature might have intended by the original commission act of 1911 to prevent capitalization of moneys expended in additions and improvements to utility properties "beyond an amount sufficient to represent the increased value of such properties, taking into account accrued depreciation. If utilities are allowed to pay out practically all of their earnings in dividends, paying for all improvements and extensions with the proceeds of new securities, and making no adequate reserve provision for replacement, the time will come when substantial replacements will be necessary, and the treasury of the utility will be empty. When that time arrives either the service will suffer for lack of important replacements, or such replacements must be paid for by an issue of new securities, which, added to securities issued to pay for original construction, will result in over-capitalization with the attendant incentive to unreasonable rates."

The argument for power under the original act has some cogency. But, even though that construction of the act of 1911 were not sustainable, it seems clear enough that the attitude of the commission afforded the *rationale* of the act of 1915. One of the commission's earliest orders regarding capitalization entered after the passage of the act of 1915 permitted capitalization of an extension at cost, less so much of it as had been paid out of the depreciation fund in a period partly prior to July 1, 1914. *Petition of Exeter & Hampton Electric Co.*, 5 N. H. P. S. C. 287. In connection with capitalizing this petitioner's property, the commission once took into account withdrawals and replacements. *Petition of Rockingham County Light & Power Co.*, 7 N. H. P. S. C. 96.

Its related utility, the *Derry Electric Company*, (8 N. H. P. S. C.

336), was once permitted a small issue when in emergent need of funds, before completion of an appraisal of its physical property to discover "the net value of the plant after proper deductions have been made." It was added: "If this petition is granted, there is danger that the securities outstanding will exceed the value of the physical property, which is very undesirable." The emergency permission to issue the bonds was given with the stipulation that all earnings in excess of interest charges and dividends on the preferred stock must be invested in the plant until the commission otherwise ordered. The legislative policy, and commission practice, since 1915, have been to restrict capitalization of indebtedness by consideration of both actual cost and depreciation. Stated otherwise, it is a policy of keeping such a capitalization and "cost less depreciation" (present value) in reasonable balance.

The petitioner seeks to issue securities for the payment of an indebtedness incurred since July 1, 1914. It does not matter whether this indebtedness is legal capital or not. Reasons might be found for calling it a legal debt of a capital nature, but without character as legal capital. Whichever it is, it is to be funded or refunded in such manner as will result in a legal capitalization consistent with the public good. The commission is empowered to inquire into the actual cost of the property to be represented by the proposed capital issues, and also into its actual depreciation. Upon the latter inquiry, the present value of the property may have probative value. If so, that may be investigated.

The primary concern of the commission in ascertaining the public interest for purposes of capitalization is the protection of the consuming public. An undercapitalization desired by the utility will probably not adversely affect the public interest in the usual case. But if it appears, upon all of the evidence, that the capitalization sought is so high that the utility, because of inability to earn operating costs, depreciation and other charges, will not be able to give its consumers at reasonable rates the service to which they are entitled, then the primary public interest may be found to be affected injuriously. Whether there is any secondary interest of the public requiring protection (*State* v. *Company*, 86 N. H. 16, 24), such as that of investors, we are not called upon by the questions presented to decide. But the effect of capitalization on the credit of the utility, as bearing upon its ability to command the means of reasonable service, may be a factor. *State* v. *Company, supra,* at page 25; *Pittsburgh &c. Co.* v. *Interstate Commerce Commission,* 293 Fed. 1001, 1004.

From this discussion we conclude that, upon the record before us, it cannot be said as a matter of law either that the issuance of the proposed securities is consistent with the public good or that it should be approved. The propriety of the granting of the petition is in the first instance a question of fact for the commission to determine after such hearing and investigation as will develop the pertinent facts and circumstances.

(3) Determinations of facts in former proceedings for the issuance of securities by the petitioner and its predecessors, such as the cost of additions, extensions and improvements, are final and conclusive as to the existence of such facts. In such matters the commission has acted judicially, and "a valid administrative judgment has the same force of obligation and finality as a judicial one." *Opinion of the Justices*, 87 N. H. 492.

(4) The answer to the fourth inquiry is that the commission may withhold permission to issue securities similar to those retired in 1926 to the extent that such securities, taken together with the other outstanding securities exceeds the difference between (a) the fair cost of the properties against which the retired securities were issued and (b) the actual depreciation of those properties. Upon element (b) the commission may give proper weight to evidence of present values within the limits already indicated.

(5) The commission may consider what type or types of securities are sought to be issued, and if they find that the type or types will probably affect injuriously the public interest in rates and service, or either, may give appropriate weight to that fact in its decision.

(6) If the commission finds it for the public good that securities be issued, it may not directly determine and impose upon the utility a financial structure of its own devising. It may approve all, none or a part of the securities sought, in accordance with its findings of what the public good requires, but the statute permits it to act only upon the issues prayed for. P. L., c. 241, ss. 1-4. As a practical matter, the judgment of the petitioner that it is not good business policy to issue the securities permitted by the commission's order may result in one or more successive petitions and in the end the utility may bow to the will of the commission. However, the utility may "take or leave" what the commission permits, and the commission may not order it to take it and not leave it. The utility may still try to find an alternative of which the commission can approve.

(7) Independently of the outcome of this petition, the petitioner is entitled as a matter of law to capitalize its fair expenditures for

additions and improvements made since 1924, less deductions for depreciation and withdrawals from plant permitted by statute. It is obvious, however, that the problem would be simplified, and made completely practical and less expensive to all concerned, if the petitioner should amend its petition and seek capitalization of the whole property as it stands.

(8) The answer to the eighth question is, no.

*Remanded.*

All concurred.