Public Utilities Commission
No. 82-366

## APPEAL OF PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE
## (New Hampshire Public Utilities Commission)

December 27, 1982

*Sulloway, Hollis & Soden,* of Concord (*Martin L. Gross, Margaret H. Nelson,* and *Dorothy M. Bickford* on the brief, and *Mr. Gross* orally), for Public Service Company of New Hampshire.

*Ferriter & Barna P.C.,* of Boston, Massachusetts (*Nicholas J. Scobbo, Jr., Kenneth M. Barna, Robert A. Guttman,* and *Robert P. Rodophele* on the brief, and *Mr. Barna* orally), for the Joint Owners Group.

*Gregory H. Smith,* attorney general (*Bruce E. Mohl,* attorney, and *F. Joseph Gentili,* consumer advocate, on the brief and orally), for the State and the New Hampshire Consumer Advocate.

*New England Legal Foundation,* of Boston, Massachusetts (*Joseph O. Alviani* and *Marcia Drake Seeler* on the brief), by brief for the Business and Industry Association of New Hampshire, as amicus curiae.

*Douglas I. Foy* and *Alan Wilson,* of Boston, Massachusetts, by brief for the Conservation Law Foundation of New England, Inc., as amicus curiae.

DOUGLAS, J. This is an appeal pursuant to RSA 541:6 from conditions placed upon the future issuance of securities by Public Service Company of New Hampshire (PSNH) under an order of the New Hampshire Public Utilities Commission (PUC). Several matters relating to the proper role of a quasi-judicial regulatory agency are raised by the appealing parties.

On May 18, 1982, the PUC initiated Docket No. DF 82-141 on its own motion. The order recited that the docket was opened

> "for the purpose of receiving any and all information on (1) the question of whether there have been bona fide responses and sustained progress by the other New England electric utilities in alleviating the PSNH financial problems stemming from . . . their level of ownership in Seabrook; (2) the immediate fate of Seabrook II as to whether to delay [it] or not and if so how long; and (3) what if any conditions to impose upon future PSNH financing . . . ."

The PUC convened hearings on this docket on June 14, 1982. Hearings were held over the course of six days, concluding on July 2, 1982. At the initial hearing, the PUC purported to restrict the scope of the proceedings to the issue of whether there had been a "bona fide response" and "sustained progress" in reducing PSNH's ownership interest in the Seabrook project and in the Millstone 3 nuclear facility in Connecticut. Specifically, the PUC announced that its inquiry would focus upon whether other New England utilities had demonstrated a bona fide response to the options of either purchasing some of PSNH's shares of the nuclear-plant-construction projects or making other arrangements to alleviate the financial burden of the company. The PUC stated that since Docket No. DF 82-141 emanated from Docket No. DF 82-63, it would incorporate the record in the latter docket by reference. The latter docket involved an issuance of common stock by PSNH.

Following the conclusion of proceedings on Docket No. DF 82-141, the PUC on July 16, 1982, issued a report and an order. In its Order No. 15,760, the PUC mandated that the following terms and conditions be attached to all PSNH financing undertaken after the date of the report and order:

"(1) Pursuant to the provisions of RSA 369, to the extent these proceeds are used for the furtherance of work at Seabrook Station Site, these proceeds can only be used for the furtherance of work on Seabrook I and common plant associated with both units.

(2) None of the proceeds of any future securities issue either of a long or short term nature can be used in whole or in part for construction of Unit II."

These terms were imposed until one of the following conditions was met: (1) the successful divestiture by PSNH of part of its ownership interest in the Seabrook project so that it owned no more than twenty-eight percent of the plant; (2) a demonstrated effort by other utilities to alleviate PSNH's financial condition; or (3) the completion of Seabrook Unit One. The terms were the result of the PUC's decision that these conditions strengthened the financial posture of PSNH.

On July 28, 1982, PSNH filed a motion with the PUC requesting a rehearing with respect to Report and Order No. 15,760. On August 4, 1982, the PUC denied the company's motion for rehearing. PSNH subsequently filed a notice of appeal with this court and a motion requesting the suspension of PUC Order No. 15,760 pending the appeal. On August 19, 1982, we accepted the appeal and granted the motion for suspension of the order.

The records of two other dockets referred to in Docket No. DF 82-141 were filed with this court. Those other related matters are: Docket No. DR 81-87, regarding temporary and permanent rates, which was decided on January 11, 1982; and Docket No. DF 82-63, regarding a common stock issuance, in which PSNH offered evidence that a two-year delay in Unit Two would increase the cost to consumers by approximately $950,000,000 during the period 1986–2001.

We first must determine the scope of the PUC's authority to condition PSNH's future financing relative to Seabrook Two in light of the financing provisions of RSA chapter 369 and the certificate of site and facility that was granted over eight years ago to PSNH pursuant to RSA chapter 162-F.

■■ The PUC is a creation of the legislature and as such is endowed with only the powers and authority which are expressly granted or fairly implied by statute. *Petition of Boston & Maine Railroad*, 82 N.H. 116, 116, 129 A. 880, 880 (1925). Consequently, the authority of the PUC to approve or disapprove the issuance and sale of stock, bonds, or notes by a utility is limited to that specifically delegated or fairly implied by the legislature and may not be derived from other generalized powers of supervision.

Pursuant to RSA 369:1, the PUC is given specific statutory authority to approve or disapprove a security issuance proposed by a public utility. The PUC's actions on such proposals are, however, limited by the terms of that statute:

> "The proposed issue and sale of securities will be approved by the commission where it finds that the same is consistent with the public good. Such approval shall extend to the amount of the issue authorized and the purpose or purposes to which the securities or the proceeds thereof are to be applied, and shall be subject to such reasonable terms and conditions as the commission may find to be necessary in the public interest . . . ."

RSA 369:1.

The question of law in this case is a simple one: Did the PUC properly interpret and apply RSA 369:1? The State contends that the plain language of RSA 369:1 and our cases interpreting it and its predecessor statutes provide ample authority for the PUC to prevent PSNH temporarily from using any future financings for Unit Two. We disagree.

This court has long recognized as public policy that the owners of a utility do not surrender to the PUC their rights to manage their own affairs merely by devoting their private business to a public

use. In *Grafton County Electric Light & Power Co. v. State*, 77 N.H. 539, 94 A. 193 (1915), we construed the phrase "public good" within the meaning of a public-utilities statute substantially similar to the forerunner of RSA 369:1:

> "If it is reasonable that a person or a corporation have liberty to take a certain course with his or its property, it is . . . for the public good. It is the essence of free government that liberty be not restricted save for sound reason. *Stated conversely: it is not for the public good that public utilities be unreasonably restrained of liberty of action, or unreasonably denied the rights as corporations which are given to corporations not engaged in the public service.*"

77 N.H. at 540, 94 A. at 194 (emphasis added).

■ We recently reaffirmed the historical role between government and the free market under part two, article eighty-three of the New Hampshire Constitution when we said in a public utilities case that the PUC's role is to regulate "so that the constitutional rights of free trade and private enterprise are disrupted as little as possible." *Appeal of Omni Communications, Inc.*, 122 N.H. 860, 862–63, 451 A.2d 1289, 1291 (1982).

■ In the instant case, the PUC as a matter of law misinterpreted the scope of its authority to define the "public good" and abused its discretion in acting in the "public interest" by *prohibiting* the expenditure of captial received in a routine stock issuance on construction of Unit Two of Seabrook Station. We say this in light of the ensuing discussion of RSA chapter 162-F and our doctrine of "vested rights," because the PUC was precluded by RSA chapter 162-F from temporarily denying PSNH permission to finance construction of Unit Two.

The State argues that the legislature did not preempt the PUC's authority to regulate a public utility's financing when it enacted RSA chapter 162-F, a comprehensive scheme to address environmental and economic questions concerning whether and where power plants such as Seabrook should be built. We read the statute more broadly than the State suggests.

The bulk power supply site evaluation committee (SEC) was established to consolidate the regulation of planning, siting, and construction of bulk electric power supply facilities, RSA 162-F:1 (Supp. 1981), which includes certain electric transmission lines designed to carry 100 or more kilovolts. RSA 162-F:2, I(b), (c). The SEC is composed of various agency and department heads and

technicians, RSA 162-F:3, whose duties include reviewing applications, holding public hearings, and making findings of fact for and submissions to the PUC. RSA 162-F:5, :7, :8. Findings of fact by the SEC on siting, land use, and air and water quality are binding on the PUC, which issues or denies a certificate of site and facility for the proposed project after finding that certain requirements have been satisfied. RSA 162-F:8, I, II, IV. The certificate, when issued, is final, subject only to judicial review. RSA 162-F:8, IV.

We recently observed:

> "After following the appropriate procedures required by RSA ch. 162-F, the PUC, in January 1974, issued a certificate of site and facility to PSNH for its nuclear generating plant in Seabrook, New Hampshire. . . .
>
> In June 1976, the Atomic Safety and Licensing Board of the Nuclear Regulatory Commission (NRC) issued a construction permit to PSNH, which was upheld by the federal courts."

*Appeal of Society for Protection of Environment of S.E. N.H.*, 122 N.H. 703, 705–06, 449 A.2d 1205, 1207 (1982) (citation omitted). In addition to that decision, we have had at least two other occasions in the last seven years to review and affirm the scope and propriety of PSNH's certificate as including the resolution of *economic* matters relating to construction of a power plant. *See Public Serv. Co. v. Town of Hampton*, 120 N.H. 68, 72, 411 A.2d 164, 166–67 (1980); *Society for Protection of N.H. Forests v. Site Evaluation Comm.*, 115 N.H. 163, 170–71, 337 A.2d 778, 784–85 (1975).

The specific legislatively required findings that must be made by the PUC before issuing a site-and-facility certificate are that the proposed facility:

> "(a) Will not unduly interfere with the orderly development of the region with due consideration having been given to the views of municipal and regional planning commissions and municipal legislative bodies;
>
> (b) Is required to meet the present and future demand for electric power;
>
> (c) Will not adversely affect *system stability* and *reliability* and *economic factors;* and
>
> (d) Will not have an unreasonable adverse effect on esthetics, historic sites, air and water quality, the natural environment, and the public health and safety."

RSA 162-F:8, I (emphasis added). If the PUC makes these findings, it must issue a certificate of site and facility which "shall be final and subject only to judicial review." RSA 162-F:8, IV. RSA 162-F:12 goes on to provide that a certificate may be revoked or suspended only:

"I. For any material false statement in the application or in the supplemental or additional statements of fact or studies required of the applicant.

II. For failure to comply with the terms or conditions of the certificate.

III. For violation of the provisions of this chapter, regulations issued thereunder, or order of the commission."

The legislature specifically affirmed its policy, consistent with RSA chapter 162-F, by adopting House concurrent resolution 6, which provided, among other things, "[t]hat both units of the Seabrook nuclear power plant should be completed and brought to full generating capacity as quickly as possible . . . ." N.H.H.R. JOUR. 402, 405 (1981); *see id.* at 862 (resolution adopted by Senate concurrence).

■■ The July 16 decision of the PUC refers to the certificate of site and facility as a "building permit." As such, PSNH has long passed the point where its right to complete the twin units vested:

"In this State, the common-law rule is that 'an owner, who, relying in good faith on the absence of any regulation which would prohibit his proposed project, has made substantial construction on the property or has incurred substantial liabilities relating directly thereto, or both, acquires a vested right to complete his project in spite of the subsequent adoption of an ordinance prohibiting the same.' "

*Henry and Murphy, Inc. v. Town of Allenstown*, 120 N.H. 910, 912, 424 A.2d 1132, 1133–34 (1980). In the *Allenstown* case, the plaintiff had developed seventy percent of a subdivision and had expended enough money to lead us to the conclusion that the plaintiff had a vested right to complete the development notwithstanding a regulatory change in the minimum lot-size requirements. Regulated industry or not, the owner or developer "who, in good faith, makes substantial construction on his property 'acquires a vested right to complete his *project* . . . .' " *Id.* at 913, 424 A.2d at 1134 (citations omitted) (emphasis in original). If ever a case for vesting applied, it

is the expenditure of hundreds of millions of dollars to date at Seabrook!

Within the past few months, this court considered the vesting doctrine in connection with the right of a mobile-home-park owner to complete a project that began several years earlier:

> "The fundamental and inalienable property right that vests in a property owner has as its foundation this State's Constitution. Part I, article 2 of the New Hampshire Constitution guarantees all persons the right to acquire, possess, and protect property. This guarantee has been deemed so specific as to 'necessarily limit [] all subsequent grants of power to deal adversely with it.' . . . Similarly, every person has the right to have his enjoyment of property protected. . . . 'These two constitutional provisions are limitations upon the so-called police power of the State and subdivisions thereof, and nullify arbitrary legislation passed under the guise of that power.' "

*Grondin v. Town of Hinsdale*, 122 N.H. 882, 885–86, 451 A.2d 1299, 1301 (1982) (citations omitted).

Furthermore, the PUC cannot do indirectly what it cannot do directly; namely, "take" someone's property without full and fair compensation.

> "The substantive issue raised in this case involves a principle that lies at the very foundation of civilized society as we know it. The principle that no man's property may be taken from him without just compensation reaches at least as far back as 1215, when on 'the meadow which is called Runnymede' the Barons of England exacted from King John the Magna Carta, which contains at least three references to this fundamental truth. . . . Our own constitution provides that 'no part of a man's property shall be taken from him, or applied to public uses, without his consent . . . .' "

*Burrows v. City of Keene*, 121 N.H. 590, 595–96, 432 A.2d 15, 18 (1981).

■■ Be it one unit or two, our constitution is explicit that "no *part* of a man's property shall be taken from him" without due process and compensation. N.H. CONST. pt. I, art. 12. Because "the constitution prohibits any taking of private property by whatever means without compensation, the just compensation requirement applies whenever the exercise of the so-called police power results in a 'taking of property.' " *Burrows v. City of Keene*, 121 N.H. at 597,

432 A.2d at 19. The government may not do under an implied power that which it cannot do under an express power. "[T]he just compensation principle . . . applies if the abridgement of the rights is accomplished by a governmental regulation restricting the exercise of [vested property] rights." *Id.*, 432 A.2d at 19.

No *direct* taking would be involved here unless the legislature found a public purpose and necessity, backed up by compensation through a multi-billion-dollar bond issue. Yet, regulatory agents of the State may, by action or regulation, conduct themselves in such a way as to effect what the law terms an "inverse condemnation." Such physical acts, *Sundell v. Town of New London*, 119 N.H. 839, 845, 409 A.2d 1315, 1318 (1979); *Eaton v. B.C. & M.R.*, 51 N.H. 504, 513 (1872), or regulatory excess short of a physical infringement, *Grondin v. Town of Hinsdale*, 122 N.H. at 887, 451 A.2d at 1302; *Burrows v. City of Keene*, 121 N.H. at 597, 432 A.2d at 19, are equally constitutionally infirm. We see no greater right of the government to "take" merely because a regulated utility is involved.

The United States Supreme Court recently reaffirmed its holding in *Penna. Coal Co. v. Mahon*, 260 U.S. 393 (1922), that a State's action that "substantially furthers important public policies may so frustrate distinct investment-backed expectations as to amount to a 'taking.' " *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 127 (1978). Likewise in *Loretto v. Teleprompter Manhattan CATV Corp.*, 102 S. Ct. 3164 (1982), the Court explicitly reminded us that "the economic impact of . . . regulation, especially the degree of interference with investment-backed expectations, is of particular significance" in determining whether a taking has occurred. *Id.* at 3171.

As Justice Oliver Wendell Holmes reminded us, courts are "in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Penna. Coal Co. v. Mahon*, 260 U.S. at 416. Similarly, the PUC may not by Order No. 15,760 deny PSNH the financial means to complete construction of Unit Two without adequately compensating the utility.

The interplay of RSA 369:1 and RSA chapter 162-F might have permitted the action of the PUC if the unused or uncompleted second unit could clearly be amortized over a period of years and recovered through the rate structure. Unfortunately for the PUC, the so-called anti-CWIP law, RSA 378:30-a (Supp. 1981), might prevent this from happening. There may therefore be no mechanism, as exists in many other States, to permit the PUC constructively or

actually to cancel Unit Two without a noncompensable taking occurring.

The foregoing analysis demonstrates that the PUC under the facts of this case has no direct or implied authority under RSA 369:1 to impose the sweeping conditions set forth in its July 16 decision. The PUC is nevertheless still free to attach reasonable conditions to any future financings under RSA 369:1 as it properly finds to be "necessary in the public interest." RSA chapter 162-F, the enabling statute under which PSNH received a certificate to construct a two-unit generating plant, further precludes a finding of any such authority in the PUC, because to imply such authority would undermine the careful statutory scheme of that chapter. Moreover, the exercise of such authority conflicts sharply with a clearly-enunciated State policy favoring speedy completion of both units and impinges upon the constitutionally vested right of PSNH to complete its project as certificated. Indeed, the clear intent of RSA chapter 162-F is to prevent precisely what is happening in the current case—a decision, years after issuance of the certificate and after a major financial commitment, saying in retrospect that it would have been better for management to have proceeded differently.

Thus, we find no authority for the PUC's statement that it could order a delay in financing of Unit Two at Seabrook. Of course, mangement may do so if sound business judgment so warrants.

Finally, we turn to the due process issues raised in this appeal. Due process under our constitutional republic has, as a primary consideration, the notion that no matter how rich or how poor, all of our citizens are entitled to fundamental fairness when government agencies seek to regulate them. We recently found serious deficiencies in administrative procedures of several of our agencies, ranging from a lack of meaningful notice of a Medicaid benefit change, *Petition of Clark*, 122 N.H. 888, 891, 451 A.2d 1303, 1305 (1982); to lack of procedures which led to an "unfair and inconsistent" result in the issuance of hospital certificates of need under RSA chapter 151-C, *Appeal of Behavior Science Institute*, 121 N.H. 928, 935, 436 A.2d 1329, 1333 (1981); to agency bias and prejudgment by the water resources board, *Appeal of Lathrop*, 122 N.H. 262, 266, 444 A.2d 505, 507 (1982). Because neither our legislature nor the attorney general, *see* RSA 7:8, has yet adopted a procedure for due-process adjudication by administrative agencies, *see* H.B. 897 (1981), this court is again being called upon to write such procedures into law on a case-by-case basis.

PSNH claims that a series of actions by the PUC and its chairman deprived it of its right to a fair hearing. To cite but one salient example, the PUC majority concluded that PSNH was "imprudent" in increasing its workforce to 8,313. The potential consequences of such a determination for the utility are far-reaching because "imprudent" costs may not be recovered in the rate-making process. *See Legislative Util. Consumers' Council v. Public Util. Com.*, 117 N.H. 972, 975, 380 A.2d 1083, 1084–85 (1977). The alleged imprudence of PSNH's hiring practices was clearly not within the stated purposes set forth by the PUC when Docket No. DF 81-141 was opened in May 1982.

This fact alone violates our clear holdings that "notice must give . . . [parties] the opportunity to have a hearing on the government's action . . . ." *Petition of Clark*, 122 N.H. at 891, 451 A.2d at 1305; *see NLRB v. Temple-Eastex, Inc.*, 579 F.2d 932, 936 (5th Cir. 1978); 3 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 14:11, at 50 (2d ed. 1980). To turn a financing hearing into a prudency determination that could affect future rates, without proper notice, is not in conformity with due process.

This is especially true when the source of the figure used by the PUC in making its finding is the result of an *ex parte* communication initiated by PUC Chairman Michael Love. From affidavits before the court, it appears that on the last day of the hearings, July 2, 1982, a call was initiated resulting in information being obtained by the chairman from PSNH regarding the staffing levels at Seabrook. While the number of employees obtained and used in the PUC opinion, 8,313, was accurate, it included 808 absentees. Therefore, the actual number of persons working on July 1 was apparently only 7,505. This is relevant because in Docket No. DF 82-63 there had been testimony that at a level of 7,800 or more workers, efficiency could be lost and construction time would not be gained. This in turn led the PUC majority in Docket No. DF 82-141 to find that the number of workers was imprudent, without input from PSNH that could have averted such a finding.

Due process is a flexible standard in the administrative law context. We expect and will require meticulous compliance with its mandates, however, in the case of the PUC because as long ago as 1929 this court recognized that the PUC was created by the legislature as a "state tribunal, imposing upon it important judicial duties." *Parker-Young Co. v. State*, 83 N.H. 551, 556, 145 A. 786, 789 (1929). When it is not acting in a rule-making capacity but in an adjudicative one, *see* 3 K. DAVIS, *supra* § 14:5, at 24–28, the procedural posture of the PUC is different. "If private rights are affected by the board's decision the decision is a judicial one."

*Petition of Boston & Maine Corp.*, 109 N.H. 324, 327, 251 A.2d 332, 336 (1969) (decision of PUC, closing railroad grade crossing, was judicial).

The legislature reaffirmed that the PUC frequently performs an adjudicative role, when it restructured the PUC in 1979. Speaking on behalf of the Senate committee reporting out House bill 261, Senator Rock observed that the pay of a commissioner was being raised to "that equal to the superior court" because the PUC was a "quasi-judicial body." N.H.S. JOUR. 1678 (1979); *see id.* at 1225, 1679 (1981). This situation still prevails. *See* RSA 94:1-a (Group T) (Supp. 1981); RSA 491-A:1 (Supp. 1981). If this agency is to serve a judicial function, it will have to comport itself accordingly. *See, e.g.*, RSA 495:1.

The legislature has recognized the need for neutrality and impartiality and has required that a commissioner conduct himself in accordance with certain ethical standards, including the following:

> "I. Avoidance of impropriety and the appearance of impropriety in all his activities;
>
> II. Performance of his duties impartially and diligently;
>
> III. Avoidance of all ex-parte communications concerning a case pending before the commission;
>
> IV. Abstention from public comment about a matter pending before the commission and require similar abstention on the part of commission personnel;
>
> V. Require staff and personnel, subject to commission direction, to observe the standards of fidelity and diligence that apply to the commissioners;
>
> . . .
>
> VII. Disqualify himself from proceedings in which his impartiality might be reasonably questioned . . . ."

RSA 363:12 (Supp. 1981).

██ ██ Thus, *ex parte* communications or public comment and press releases about pending cases are clear violations of the standard of conduct expected of a commissioner. To be paid as a judge, one must act like a judge. *See* N.H. SUP. CT. R. 38, Canon 3 A(4), (6) (CODE OF JUDICIAL CONDUCT). Due process requires members of the PUC to refrain from *ex parte* communications if such an agency is not only to be, but also to appear to be, impartial. *See Appeal of Metropolitan Prop. & Liabil. Ins. Co.*, 120 N.H. 733,

737, 422 A.2d 1037, 1040 (1980); *In re Jack O'Lantern, Inc.*, 118 N.H. 445, 448–49, 387 A.2d 1166, 1168 (1978).

By such a standard, we avoid turning utility matters into a political football, as often can occur in the twelve States where public utility commissioners are elected. COUNCIL OF STATE GOVERNMENTS, BOOK OF THE STATES 1982–83, at 568 (Table 1) (1982); *see* T. WILLIAMS, HUEY LONG 153–80 (1969). Whatever may be the proper standard in rule-making proceedings, *see* 3 K. DAVIS, *supra* § 6:18, at 533–37; *id.* § 6:18, at 115–18 (Supp. 1982), we join the United States Court of Appeals for the District of Columbia in condemning *ex parte* communications by a quasi-judicial board because they "violate the basic fairness of a hearing." *National Small Shipments v. ICC*, 590 F.2d 345, 351 (D.C. Cir. 1978). In fact, the same court has also held that the merits of a case may be decided against the one who engages in such conduct. *Jacksonville Broadcasting Corporation v. FCC*, 348 F.2d 75, 78–79 (D.C. Cir.), *cert. denied*, 382 U.S. 893 (1965).

■ We hold that the PUC violated PSNH's due process rights when it concluded that the utility was "imprudent" when it allowed the number of employees at the Seabrook plant construction site to exceed 7,800. Accordingly, we vacate the finding of the PUC that PSNH was "imprudent" and order it expunged from the record below.

We, of course, recognize that the PUC must bring to its decision-making an expertise and knowledge of the industries it regulates. It must obtain reports, statistics and data from the companies that appear before it. The problem here was an ongoing contested *hearing* where counsel for PSNH was not aware of the information obtained from his client until after the hearing, nor had he been asked to see that it was provided.

The United States Supreme Court recently reaffirmed that under the Federal Constitution "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." *Schweiker v. McClure*, 102 S. Ct. 1665, 1670 (1982). Similarly, this court recently found that a "series of events" contained in a record of a hearing before the water resources board led us to conclude that the board had "determined the outcome prior to the hearing and decision." *Appeal of Lathrop*, 122 N.H. at 266, 444 A.2d at 507.

The language used during the hearings on the three dockets filed as a record in this case, Docket Nos. DR 81-87, DF 82-63, and DF 82-141, contains intemperate statements such as "financial brinkmanship" (Docket No. DF 82-141). Also appearing is the curious statement that the PUC "will not accept any forecasts or financial

presentations of the Company unless we are convinced that such analyses are consistent with the findings and assumptions of this Commission" and that the PUC will use a "heavy hand" if PSNH does not do its bidding (Docket No. DR 81-87). In its January 11, 1982, decision in Docket No. DR 81-87, the PUC said PSNH was "playing a financial shell game" and even stated that PSNH's information "simply cannot be trusted, nor should they be trusted by the financial community or the independent rating agencies." It is little wonder that the New York Stock Exchange had to suspend trading in PSNH stock in January of this year after the PUC's references to the company caused investor alarm. The PUC must remember that it is a regulatory body, not a political soapbox.

Undoubtedly, the PUC, PSNH, and this court will be faced with other Seabrook-related issues in the future. In finding procedural and due process error below by the PUC majority, we should not be misunderstood as saying that management has a blank check. Because of the so-called anti-CWIP law, RSA 378:30-a (Supp. 1981), the day will come when a properly noticed hearing will be necessary to determine what costs associated with Seabrook are to be borne by the *consumers* through electric rates and what costs are to be borne by the *stockholders and investors*. Until that time, there can be no prudency determination because ratepayers are not now paying for Seabrook construction work in progress.

■ Thus, while management in the first instance may be free generally to make its own decisions about its level of investment in new construction, *see Appeal of Legislative Utility Consumers' Council*, 120 N.H. 173, 175, 412 A.2d 738, 739 (1980), it must bear in mind that as a regulated company not *all* costs may be recovered from the public when the plant is completed.

A vested right to build is not a vested right to have customers pay. PSNH itself agrees that the PUC may reject management decisions "[w]hen inefficiency, improvidence, economic waste, abuse of discretion, or action inimical to the public interest are shown." *Re Public Service Company of New Hampshire*, 62 N.H.P.U.C. 83, 92, aff'd, *Legislative Util. Consumers' Council v. Public Util. Com.*, 117 N.H. 972, 380 A.2d 1083 (1977); *see* N.H.P.U.C. Docket No. DF 82-141 (July 16, 1982) (McQuade, Commissioner, dissenting).

Nor should we be misunderstood to suggest that, prior to any request by PSNH to include Seabrook construction costs in the rate base, the PUC is precluded from fully exercising its statutory authority consistent with this opinion. For instance, in a properly noticed manner, the PUC has full authority to commence an inquiry under RSA 365:5, to require PSNH to provide information under

RSA 365:15, to make investigation and disclosure under RSA 365:19, and ultimately within constitutional restraints to reach whatever result the record of such proceedings discloses and supports.

 The PUC is legislatively empowered to be "the arbiter between the interests of the customer and the interests of the regulated utilities." RSA 363:17-a (Supp. 1981). The PUC staff may continue to comment upon and make recommendations regarding demand, cost, and other matters affecting public utilities, *see* RSA 363:27 (Supp. 1981), so long as such activities do not impinge upon the impartiality of the PUC commissioners.

> *Orders in Docket No. DF 82-141 vacated; case remanded for expungement of imprudency finding.*

KING, C.J., and BATCHELDER, J., dissented; the others concurred.

KING, C.J., with whom BATCHELDER, J., concurs, dissenting: Public Service Company of New Hampshire (PSNH) argues that the public utilities commission had no authority to prohibit the use of the proceeds of future issuances of securities for the construction of Seabrook Unit Two until certain conditions were met. Because I would hold that the PUC possessed such authority pursuant to RSA 369:1, which governs the PUC's authority to approve the issuance of securities by public utilities, I dissent.

The PUC has express authority to approve the issuance of securities by a utility and to impose reasonable conditions on its approval necessary for the public interest. RSA 369:1 provides in part:

"A public utility lawfully engaged in business in this state may, with the approval of the commission but not otherwise, issue and sell its stock, bonds, notes and other evidences of indebtedness payable more than twelve months after the date thereof for lawful corporate purposes. The proposed issue and sale of securities will be approved by the commission where it finds that the same is consistent with the public good. Such approval shall extend to the amount of the issue authorized and the purpose or purposes to which the securities or the proceeds thereof are to be applied, and shall be subject to such reasonable terms and conditions as the commission may find to be necessary in the public interest . . . ."

The majority accepts PSNH's argument that once a site-and-facility certificate is issued, any utility proposal for the issuance of securities must be approved if the purpose for which the proceeds would be used is one which is proper for a private corporation, in other words, for a lawful corporate purpose. The court ignores the plain language of the statute which requires that the issuance of the securities be for a lawful corporate purpose *and* requires that the PUC find that the issuance is consistent with the public good. The majority also ignores the language of the statute which allows the PUC to impose reasonable conditions on its approval of the issuance of securities.

RSA chapter 162-F, which establishes a procedure for the issuance of certificates of site and facility, does not limit the PUC's authority to impose conditions on a utility's issuance of securities. PSNH argues that it has a vested right to complete Seabrook Two and that the application of RSA 369:1 unconstitutionally infringes on that right. PSNH maintains, in effect, not only that it has a right to complete the project with its own funds, but-also that it has the right to issue any securities that it believes are necessary to finance the project.

The majority agrees that PSNH has a vested right to complete the project and to issue securities to fund the project, citing our decisions in *Henry and Murphy, Inc. v. Town of Allenstown*, 120 N.H. 910, 424 A.2d 1132 (1980) and *Grondin v. Town of Hinsdale*, 122 N.H. 882, 451 A.2d 1299 (1982). The instant case is easily distinguished. PSNH received its certificate of site and facility *after* the adoption of RSA 369:1. Therefore, PSNH knew when it received the certificate that it could not issue securities to fund the construction of the Seabrook plant without PUC approval. In contrast, both the *Allenstown* and *Grondin* cases involved regulations that were adopted after the parties' rights had vested.

RSA 369:1, which requires the PUC to approve the issuance of securities, reflects a recognition by the legislature that the PUC must have some control over the issuance of securities by utilities because of the relationship between the cost of a project and the fair rate of return to which a utility is entitled. *See State v. New Hampshire Gas & Electric Co.*, 86 N.H. 16, 24, 163 A. 724, 728–29 (1932); 64 AM. JUR. 2d *Public Utilities* § 255, at 761 (1972). The court's decision renders the PUC a rubber stamp for any financing proposal advanced by a utility. It gives PSNH a blank check to obtain as much money as it desires from the issuance of securities and to spend it exactly as it wants. To paraphrase our decision in *Appeal of Public Serv. Co. of N.H.*, 122 N.H. 919, 922, 451 A.2d 1321, 1324 (1982), PSNH cannot ride two horses; it cannot claim to have

unfettered power to decide how to finance a project, and still expect the PUC to pass on the cost of such financing to ratepayers. Nor can it expect the legislature to bail it out in the future, if its unbridled power to issue securities ends in financial disaster.

The majority's criticism of the PUC for its intemperate remarks at prior hearings is ironic in light of the record of those hearings. The record discloses that the PUC showed constant concern about the financial health of PSNH, and about its continued viability as a utility. Beginning in May 1979, when PSNH filed a request with the PUC to permit it to divest itself of twenty-two percent ownership in Seabrook, thereby reducing its ownership interest to twenty-eight percent, the PUC has shown a willingness to work with PSNH to improve its financial position. Although a request for emergency rates that was filed in January 1981 was denied, the PUC allowed a rate increase of $28,900,000 in April 1981. In granting this order, the PUC stated that a major change in the company's plans for Seabrook was necessary to improve PSNH's financial plight. It ordered PSNH to reduce its ownership interest in Seabrook to twenty-eight percent.

In March 1982, PSNH filed a request for the PUC to approve the issuance of three million shares of common stock. The PUC approved the issuance of the shares but stated that the proceeds of the issuance could not be used for any additional commitments of materials, labor, or services for Seabrook Two. The PUC made clear that it would reopen proceedings in three months to determine if PSNH had made progress in reducing its ownership interest in Seabrook. PSNH then requested the approval of the PUC for the issuance of sixty million dollars in general and refunding mortgage bonds. The PUC also approved this financing, imposing the same conditions as it imposed on the common stock issuance.

Finally, in May 1982, the PUC opened Docket No. DF 82-141 to determine whether PSNH had made progress in reducing its ownership interest in Seabrook. Only after a hearing showed that PSNH had made no progress in reducing its ownership of Seabrook did the PUC impose the conditions at issue in this case, prohibiting the use of future financing for work on Seabrook Unit Two.

Contrary to the assertion of the majority that the PUC acted intemperately, this history indicates that the PUC acted reasonably in the prior proceedings and with concern for the financial health and long-term viability of PSNH.