Public Utilities Commission
No. 84-188
No. 84-204
No. 84-207

## Appeal of Roger Easton

## Appeal of Consumer Advocate Michael Holmes

## Appeal of Gary McCool
(New Hampshire Public Utilities Commission)

July 13, 1984

*Roger L. Easton*, of Canaan, by brief and orally, pro se.

*Michael L. Holmes*, of Concord, by brief and orally, as Consumer Advocate.

*Gary McCool*, of Rumney, by brief and orally, pro se.

*Hall, Morse, Gallagher & Anderson*, of Concord (*Mayland H. Morse, Jr.*, on the brief, and *Thomas Morse* orally), for New Hampshire Electric Cooperative, Inc.

*Gregory H. Smith*, attorney general, and *Larry M. Smukler*, general counsel, public utilities commission (*Bruce E. Mohl*, assistant attorney general, and *Mr. Smukler* on the brief, and *Mr. Mohl* orally), for the New Hampshire Public Utilities Commission.

*Douglas I. Foy* and *Armond M. Cohen*, of Boston, Massachusetts (*Mr. Foy* and *Mr. Cohen* on the brief, and *Mr. Foy* orally), for the Conservation Law Foundation of New England, Inc.

*Sulloway, Hollis & Soden*, of Concord (by *Martin L. Gross*), filed a memorandum on behalf of Public Service Company of New Hampshire, as amicus curiae.

DOUGLAS, J. This is an appeal from the public utilities commission's approval of another financing request made necessary by the rapidly increasing costs and uncertainty surrounding the Seabrook nuclear generating project (Seabrook). We are asked to clarify the scope of financing proceedings pursuant to RSA chapter 369.

On November 18, 1983, the New Hampshire Electric Cooperative, Inc. (Co-op), in accordance with RSA 369:1, petitioned the public utilities commission (PUC) for authority to borrow $111,000,000 from the Rural Electrification Administration (REA) "to enable it to continue to finance its [2.17391%] interest in Seabrook Units I and II." A hearing on the petition before the PUC was scheduled for January 12, 1984, pursuant to RSA 369:4, and intervenor status was granted to appellants Roger Easton, Gary McCool and Consumer Advocate Michael W. Holmes.

At the January 12, 1984, hearing, the PUC granted Holmes' motion to postpone. At a subsequent hearing on February 8, 1984, the commission granted the Conservation Law Foundation's motion to intervene and heard arguments on the scope of the financing proceedings. When it became apparent that the proceedings could not go forward until the PUC ruled on their proper scope, the commission suspended the hearing and directed the parties to file written memoranda on the scope of the proceedings under RSA chapter 369. A further hearing was scheduled for February 16, 1984.

In accordance with the commission's order, the intervenors argued that the proceedings must include, as part of the required

determination that the financing "be consistent with the public good," RSA 369:4, evidence of whether the object of the desired funding, that is, the Co-op's continued participation in Seabrook, is "prudent." The intervenors stressed the significance of this inquiry given Seabrook's ballooning costs, construction delays, reduced capacity estimates, reduction in demand growth, and the demonstrated opportunities for alternative generation and conservation— all factors which had changed dramatically since the PUC's initial approval, in 1981, of the Co-op's $75,750,000 participation in Seabrook. The Co-op, by contrast, argued that the proceeding should be limited to examining the amount of the proposed financing and to considering the fairness and reasonableness of the terms of the financing.

At its February 16, 1984, hearing, the PUC ruled that its understanding of RSA chapter 369 and, more specifically, RSA 369:4 was such that the scope of the proceedings thereunder is limited to the narrow question of whether the proposed borrowing on the terms set forth in the petition is in the public good. The commission then stated that it would proceed only on the points that were material and relevant to the proceeding; namely, (1) the amount of the financing and (2) the reasonableness of its costs and terms.

Having ruled on the scope of the proceedings, the PUC took evidence on February 16 and 17, 1984. In a decision dated February 24, 1984, a majority of the commission reiterated its February 16 conclusion and cited *Appeal of Public Service Company of New Hampshire*, 122 N.H. 1062, 454 A.2d 435 (1982) as authority. The commission granted the Co-op's motion to strike evidence submitted by the intervenors as being "irrelevant and outside the scope of the proceedings."

The commission then turned to the question whether the proposed borrowing on the terms set forth therein was in the public good. The majority issued its ruling by looking merely at the *terms* of the proposed borrowing. It concluded that the financing rate, being nearly as low as the government borrowing rate, and the amount of the proposed financing were reasonable and in the public good. The commission thus approved the Co-op's authority to borrow $111,000,000. The majority noted, however, that it was "very concerned about what the upcoming cost estimates will mean with respect to the economics of both Seabrook Units and their impact on the financing plans of the participants" and that, accordingly, "approval of the instant financing is not to be taken as the commission's last word on the continued prudency of the Co-op's Seabrook participation."

Commissioner Aeschliman, in her dissent, argued that the majority was in error in narrowly defining the scope of the proceedings in view of the changing completion estimates and the uncertainty of Unit II's completion. She concluded, however, that even given the narrowness of the scope of the proceedings, as defined by the majority of the commission, the Co-op did not satisfy the requirements of the law.

The intervenors' motions for rehearing were denied, and this appeal followed. The parties ask us to define the scope of financing proceedings held pursuant to RSA chapter 369, and, consequently, to determine the role of the PUC in these proceedings.

We begin our analysis by noting that this appeal now involves the authority of the Co-op to borrow $54,000,000 to finance its interest in Seabrook. By order dated June 15, 1984, this court granted the PUC's and Co-op's motions to remand, with respect to a $57,000,000 portion of the financing at issue, which amount the Co-op now wishes to devote to the acquisition of an ownership interest in the Yankee projects. The motions to remand were denied with respect to the remaining $54,000,000 portion of the financing in issue.

RSA chapter 369 provides, in pertinent part:

> "The proposed issue and sale of securities will be approved by the commission where it finds that the same is consistent with the public good. Such approval shall extend to the amount of the issue authorized and the purpose or purposes to which the securities or the proceeds thereof are to be applied, and shall be subject to such reasonable terms and conditions as the commission may find to be necessary in the public interest . . . .
>
> The commission, after such hearing or investigation as it may deem proper, shall determine the actual or probable cost incurred or to be incurred; and, if in its judgment the issue of such securities upon the terms proposed is consistent with the public good, it shall authorize the same to an amount sufficient, at the price fixed in accordance with the laws applicable thereto, to provide funds for defraying the cost as so determined."

RSA 369:1, :4.

This court has stated that the PUC is vested with broad statutory powers. *Appeal of Granite State Elec. Co.*, 120 N.H. 536, 539, 421 A.2d 121, 123 (1980). We have held that "the primary concern of the commission in ascertaining the public interest for purposes of capitalization is the protection of the consuming public."

*Petition of the New Hampshire Gas & Electric Co.*, 88 N.H. 50, 57, 184 A. 602, 607 (1936). On the other hand, it has never been the position of this court that a utility completely surrenders its right to manage its own affairs merely by devoting its private business to a public use. *Appeal of Public Service Company of New Hampshire*, 122 N.H. 1062, 1066–67, 454 A.2d 435, 437 (1982).

In support of its position, each party cites the same three New Hampshire cases. These cases, rather than providing definitive support for either position, attempt to strike a balance between the commission's authority and management's prerogatives. It is clear that although the scales tip in favor of one or the other depending upon the specific facts and issues of each case, the PUC has a role in determining whether a proposed financing is in the public good, and that role encompasses considerations beyond merely the *terms* of the proposed financing.

In *State v. New Hampshire Gas & Electric Company*, 86 N.H. 16, 163 A. 724 (1932), we held that the commission had no authority under its financing authorization powers to punish a utility for disobeying another law. *Id.* at 31, 163 A. at 732. We underscored, however, that "the commission is given no other power than to approve or disapprove the request of the utility, either in whole or in part, *depending solely upon its judicial determination of the factual issue of whether or not the public good will be promoted thereby." Id.* at 30, 163 A. at 731 (emphasis added).

Similarly, in *Petition of New Hampshire Gas & Electric Company*, 88 N.H. 50, 184 A. 602 (1936), while we held that the commission "may not directly determine and impose upon the utility a financial structure of its own devising," *id.* at 58, 184 A. at 607, we endorsed a searching role for the commission in scrutinizing company submissions. We held that the commission "may approve all, none or a part of the securities sought, in accordance with its findings of what the public good requires." *Id.* We also stated that "[a] prime test is not to permit the capital issue to exceed, at least so much as to affect the public interest materially, the fair cost of the *property reasonably requisite for present and future use. . . ." Id.* at 55, 184 A. at 605 (emphasis added).

More recently, we construed the role of the PUC under the financing provisions of RSA chapter 369. *Appeal of Public Service Company of New Hampshire*, 122 N.H. 1062, 454 A.2d 435 (1982). In that case, we quoted language from our decision in *Grafton County Electric Light & Power Company v. State*, 77 N.H. 539, 94 A. 193

(1915), a case in which we construed the phrase "public good" within the meaning of a public utilities statute substantially similar to RSA chapter 369. There we stated:

> "This is equivalent to a declaration that the proposed action must be one not forbidden by law, and that it *must be a thing reasonably to be permitted under all the circumstances of the case.* If it is *reasonable* that a person or a corporation have liberty to take a certain course with his or its property, it is also for the public good. It is the essence of free government that liberty be not restricted *save* for *sound reason.* Stated conversely: it is not for the public good that public utilities be *unreasonably* restrained of liberty of action, or *unreasonably* denied the rights as corporations which are given to corporations not engaged in the public service."

*Id.* at 540, 94 A. at 194 (emphasis added).

In *Appeal of Public Service Company of New Hampshire supra,* we held that the PUC, as a matter of law, misinterpreted the scope of its authority to define the public good when it prohibited the expenditure of capital received in a routine stock issuance on the construction of Seabrook Unit II. Our conclusion was based on the fact that the PUC's determination contravened Public Service Company of New Hampshire's "vested right" to construct Unit II. Although we held that the restrictions the PUC imposed in that case were unreasonable, we stated that "[t]he PUC is nevertheless still free to attach reasonable conditions to any future financings under RSA 369:1 as it properly finds to be 'necessary in the public interest.'" *Appeal of Public Service Company of New Hampshire,* 122 N.H. at 1072, 454 A.2d at 441.

In *Appeal of Public Service Company of New Hampshire,* the plant was under construction and the financing request was routine. The docket was devoted to the question of whether PSNH had *bona fide* responses to its offer to sell some of its share in Seabrook.

In the instant case, the intervenors have indicated that they seek to have the PUC consider whether the uses to which the loan will be put can be economically justified compared to other options available to the Co-op. The $54,000,000 is in addition to the prior amount of $75,750,000 which was supposed to cover the Co-op's 2.17 percent interest in the Seabrook project. They seek to have the PUC determine if the capitalization of their utility is jeopardized and whether a cap on expenses or other conditions should be attached. In other words, is the Co-op's 2.17 percent ownership interest in Seabrook at

present estimated costs in the public interest? These are all legitimate matters for consideration under RSA chapter 369.

 *Appeal of Public Service Company of New Hampshire* does not stand for the proposition that the PUC's authority under RSA chapter 369 is limited to the determination of whether the *terms* of the proposed financing are in the public good. On the contrary, this court long has held that the PUC has a duty to determine whether, under all the circumstances, the financing is in the public good—a determination which includes considerations beyond the terms of the proposed borrowing. We have held that the PUC may "attach reasonable conditions as it finds to be necessary in the public interest."

Finally, we note that RSA 541:14 provides that, in an appeal such as this, "if the court shall be of the opinion that justice requires the reception of evidence of facts which have occurred since the hearing . . . it shall remand the case to the commission to receive and consider such additional evidence." *See also* RSA 541:15, :16.

In its petition, the Co-op alleged:

> "The amount of financing for which authorization is requested, $111,000,000. represents estimated additional needs for the COOPERATIVE's share of Seabrook, assuming commercial operation dates of June 30, 1986 for Unit I and March 31, 1990 for Unit II. These commercial operation dates are as required by the REA staff to reflect contingencies of possible schedule delays and construction costs in excess of present estimates of the lead participant. . . . The schedule used by [the cooperative's consulting engineers] as a starting point for the REA requested schedule extensions was the lead participant's schedule in effect as of June 20, 1983, with commercial operation dates of December 31, 1984, and July 31, 1987, for Units I and II respectively. . . .
>
> The COOPERATIVE believes and therefore alleges that the payment of the predicted costs associated with its ownership interest of 2.17391% . . . in Seabrook Units #1 and II, is for the implementation of sources of energy to meet the reasonably foreseeable needs of the COOPERATIVE."

Since the June 1983 estimates and, more particularly, since February 1984, much has occurred to qualify this case for remand under RSA 541:14. The March 1984 cost estimates have been released; Public Service Company of New Hampshire, the lead par-

ticipant, has repeatedly stated that it is on the brink of bankruptcy; work at Seabrook has been terminated for approximately ten weeks; the completion of Unit II has been seriously questioned; and new cost and completion date estimates have exceeded greatly the past figures and dates. In such circumstances, it seems futile to decide an appeal based upon premises not borne out by current reality.

In point of fact, in the instant, truncated appeal, the majority commissioners themselves expressed concerns about unknown, but foreseeable, events that have occurred since the February hearings. Chairman McQuade observed on February 24, 1984, in Supplemental Order No. 16,915:

> "The Commission, as the responsible watchdog for all New Hampshire citizens regarding utility matters, is committed to a thorough review of the updated Seabrook costs when they are available in early March. Upon review of the updated cost projections, when available, it is reasonable to assume that the Public Utilities Commission will be opening dockets to address those areas of mutual concern expressed by the intervenors. At that time, the commission will be working with factual information so that I may fully evaluate the impact of the new information on all New Hampshire ratepayers as well as the 2% ownership by the Cooperative."

Likewise, Commissioner Iacopino said:

> "Others make much to do about the possibility that PSNH's new cost studies now scheduled for March 1, 1984 may be substantially different from the figures projected by Southern Engineering and REA. However, the accuracy of PSNH figures are consistently attacked by intervenors and regulatory bodies.
>
> The Commission cannot foresee the future any better than anyone else and it must rely on the record in the proceeding before it to determine whether the approval of the financing is within the public interest.
>
> The Commission, however, can impose reasonable conditions on a financing (see RSA 369:1)."

The Co-op argues strenuously that it has a right to finance its interest in Seabrook, and that this right precludes any inquiry beyond the actual terms of the proposed financing. This position ignores the limiting language of the order in which the PUC approved the Co-op's purchase of a 2.17 percent interest in Seabrook:

"both raised the question of whether or not the $75,750,000 would be enough to cover the cooperative's responsibilities of a 2.17 percent ownership interest. Testimony was offered that there were contingencies built into the loan for inflation or unexpected costs. However, both intervenors raised the possibility that escalating costs of Seabrook might necessitate more financings. While this possibility does exist, it is not enough to negate a finding of the public good. *This amount of money at this cost rate is reasonable for the knowledge to date.*"

*Re New Hampshire Electric Cooperative, Inc.*, 66 N.H.P.U.C. 139, 140 (1981) (emphasis added).

The intervenors timely appealed that decision, but it was summarily affirmed by this court pursuant to Rule 25. *Appeal of Cooperative Members for Responsible Investment*, No. 81-231 (1981). While that affirmance is not precedent, it may arguably serve to insulate review of the initial amount of purchase. However, the Co-op does not have the right to borrow unlimited sums, and whatever sums it seeks to borrow are subject to the provisions of RSA chapter 369. "[T]he PUC may reject management decisions '[w]hen inefficiency, improvidence, economic waste, abuse of discretion, or action inimical to the public interest are shown.'" *Appeal of Public Service Company of New Hampshire*, 122 N.H. at 1076, 454 A.2d at 443 (quoting *Re Public Service Company of New Hampshire*, 62 N.H.P.U.C. 83, 92, aff'd, *Legislative Util. Consumers' Council v. Public Util. Com.*, 117 N.H. 972, 380 A.2d 1083 (1977)). Simply put, we have never held that "management has a blank check." *Id.* The extent of management's authority to invest or borrow further remains subject to the supervision of the PUC in the public interest.

Moreover, unlike *Re New Hampshire Electric Cooperative, Inc. supra*, in this case, and at this point in time, it is not a *mere possibility* that the costs of Seabrook may necessitate more financing. The June 1983 cost and completion estimates upon which the Co-op's financing petition was based are no longer valid. Hence, it is not clear that the terms and conditions of the Co-op's November 1983 petition are reasonable and in the public good.

The commission, as Chairman McQuade stated on February 24, is a "watchdog" and should now do what it then said it would do: "be opening dockets to address those areas of mutual concern expressed by the intervenors." Nothing prevents hearings under RSA 374:3, :4.

Accordingly, we remand this case to the PUC with the instruction that it proceed in a manner consistent with the foregoing opinion.

*Remanded.*

BATCHELDER, J., did not sit; DICKSON, J., sat by special assignment pursuant to RSA 490:3; all concurred.